J-S19032-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: N.M.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: A.M., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 426 EDA 2022 |

Appeal from the Order Entered January 14, 2022
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0000137-2021

| | | |
|---|---|---|
| IN THE INTEREST OF: M.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: A.M., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 427 EDA 2022 |

Appeal from the Order Entered January 14, 2022
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0000138-2021

BEFORE:   PANELLA, P.J., OLSON, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.:              **FILED JULY 07, 2022**

A.M. ("Father") appeals from the January 14, 2022, orders entered in

the Court of Common Pleas of Philadelphia County, Juvenile Division ("trial

court"), adjudicating his children, N.M.M. (born in June of 2018) and M.M.

(born in February of 2020) (collectively "the Children"), dependent after the

---

[*] Former Justice specially assigned to the Superior Court.

trial court determined Father was the perpetrator of abuse as to his infant, G.M., who died on June 16, 2020. Further, the trial court found that aggravated circumstances existed as to Father.[1]  After a careful review, we affirm.

The trial court has aptly set forth the relevant facts and procedural history as follows:

> The Philadelphia Department of Human Services ("DHS") first became aware of this family on June 17, 2018, when DHS received a General Protective Services ("GPS") report alleging that N.M.M. and Mother tested positive for marijuana at N.M.M.'s birth in June [of] 2018.  Father also admitted using marijuana on June 16, 2018. Mother and Father were residing in the same home. The GPS was determined to be valid.
>
> On March 1, 2019, Community Umbrella Agency ("CUA") implemented In-Home Services in N.M.M.'s paternal grandparents' home where Mother and Father resided.  Father was not compliant with CUA services, including failure to complete substance use assessments and parenting classes.
>
> In February [of] 2020, Mother gave birth to twins, G.M. and M.M. The twins were born premature, weighed three (3) pounds, and had gastrointestinal issues.  After spending several weeks in the hospital, G.M. and M.M. were discharged on March 26, 2020, to Mother's and Father's care.  Neither parent informed DHS or CUA of Mother's pregnancy [as to G.M. and M.M.].  DHS and CUA did not learn of Mother's pregnancy or the twins' birth until June 16, 2020.
>
> On June 16, 2020, DHS received a GPS report alleging that the Philadelphia Police Department ("PPD") was called to the family home at noon because G.M. was unresponsive.  When

_____

[1] Father filed a separate notice of appeal as to each child (N.M.M. and M.M.), which this Court consolidated. The trial court entered orders finding Mother to be a perpetrator of abuse as to G.M., as well as aggravated circumstances existed as to Mother.  Mother filed separate notices of appeal at 366-369 EDA 2022.  This Court consolidated Mother's appeals, which we address in a separate decision.

paramedics arrived, G.M. was pronounced dead. When DHS visited the family home that same day, Mother stated that Father was at work at the time of the incident. On June 17, 2020, the Philadelphia Medical Examiner's Office ("M.E.") stated that G.M. had a healing rib fracture at the time of death. On June 19, 2020, CUA visited the family home. Father would not speak to CUA and remained in a bedroom throughout the visit.

On November 25, 2020, DHS received a Child Protective Services ("CPS") report stating that the June 17, 2020, M.E. report on G.M.'s death confirmed that G.M. had a healing rib fracture, and that based on the area of the fracture, it was consistent with child abuse. The M.E. could not confirm whether the rib fracture contributed to G.M.'s death. This report was indicated. At the time of G.M.'s death, the Medical Examiner found that G.M. had a healing right posterior third rib fracture, which was consistent with inflicted trauma from child abuse. Additionally, the Medical Examiner noted that G.M. had a hemorrhage on the right side of her brain and a bilateral subdural hematoma. Mother and Father were unable to explain the cause of G.M.'s injuries.

On February 5, 2021, DHS received a CPS report stating that G.M.'s autopsy revealed that G.M.'s healing rib fracture occurred two to three weeks prior to G.M.'s death, and that intercranial hemorrhages were found in her brain. The report also alleged that G.M. was four months old at the time of her death. The CPS report alleged that G.M.'s head and rib injuries were sustained on different occasions. The report also alleged that the only explanation for G.M.'s head injury was inflicted trauma. While the cause and manner of G.M.'s death was "undetermined," the CPS report stated that G.M.'s injuries were indicative of child abuse.

On February 5, 2021, Mother and the Children, [N.M.M. and M.M.,] began residing at Pathways. That same day, DHS developed a Safety Plan stating that Pathways staff would ensure the safety of the Children and that their basic needs would be met, which included 24-hour supervision of Mother and the Children. When DHS visited Mother at Pathways on February 8, 2021, Mother stated that she and Father were residing with the Children's paternal grandmother at the time of G.M.'s death. Mother stated that she and Father were G.M.'s primary caregivers. [On February 10, 2021, DHS filed dependency petitions as to N.M.M. and M.M. requesting that they be adjudicated dependent and committed to the custody of DHS, as well as that the trial court enter findings of child abuse and aggravated circumstances

against Mother and Father based on G.M.'s unexplained injuries.] On February 27, 2021, CUA learned that Pathways was no longer able to monitor Mother and the Children to the extent necessary under the terms of the Safety Plan. That day, DHS obtained an Order for Protective Custody ("OPC") for the Children and placed them in foster care. At the March 1, 2021, shelter care hearing, the [trial] [c]ourt lifted the OPC and ordered the temporary commitment to DHS to stand. The Children were subsequently placed in Kinship Care with their paternal grandmother.

On January 14, 2022, [the trial court] held an Adjudicatory and Child Abuse hearing for [N.M.M. and M.M.[2]]. Counsel for DHS called their first witness, DHS Supervisor, Ms. Michelle Ludwig. (N.T., 1/14/2022, at 13-60). Ms. Ludwig testified that the Children first became known to DHS in June 2018 when DHS received a GPS report alleging that N.M.M. tested positive for marijuana at birth. [*Id.*] at 15[.] Ms. Ludwig testified that DHS determined the GPS report was valid and implemented In-Home Services for the family. *Id.* at 15-19. Ms. Ludwig stated that her team was assigned this case on June 16, 2020, when DHS received a subsequent GPS report that the Children's sibling, G.M., passed away. Ms. Ludwig stated that her unit was assigned this case because she supervised the fatality and near fatality unit. *Id.* at 20-25. At this point, CUA was still providing the family with In-Home Services. [*Id.* at 16.] Ms. Ludwig further testified that, at the time of G.M.'s death, the Children were in Mother's and Father's care. *Id.* at 14-18. Ms. Ludwig testified that the June 2020 GPS report noted that G.M. sustained a rib fracture. However, because G.M.'s autopsy had not been completed, DHS could not confirm the cause of the injury, and the GPS report was determined to be invalid. [*Id.* at 16-17.]

Ms. Ludwig testified that DHS received a CPS report for serious physical injury on November 25, 2020, alleging that G.M. sustained a rib fracture that was consistent with child abuse. [*Id.* at 17.] Specifically, Ms. Ludwig testified that the allegations in the CPS report included "causing bodily injury to a child through recent act or failure to act." [*Id.* at 19.] Ms. Ludwig noted that the report indicated Mother and Father as the alleged perpetrators and the victim child as G.M. *Id.* at 3-8. Ms. Ludwig further

_____

[2] We note Mother and Father were both present at the hearing and represented by counsel. Also, the trial court appointed Margaret Jefferson, Esquire, as the guardian *ad litem*/advocate for the Children.

testified that she never spoke to Father during the investigation. [*Id.* at 22.] Ms. Ludwig testified that, throughout the investigation, Father was unable to provide her or her investigative workers with an explanation as to how G.M. could have sustained the rib fracture. [*Id.* at 22.] Ms. Ludwig also testified that Mother and Father were the only identified caregivers for G.M. [*Id.* at 23.] The CPS report indicated Mother and Father as the perpetrators of abuse of the victim child, G.M. [*Id.* at 23-24.]

Ms. Ludwig testified that DHS received an additional CPS report on February 5, 2021, with allegations against Mother and Father for causing serious bodily injury to a child through recent act or failure to act. [*Id.* at 29.] Ms. Ludwig testified that this CPS report involved a head injury sustained by the victim child, G.M., and indicated Mother and Father as the perpetrators. *Id.* at 17-23. Ms. Ludwig testified that [neither Father nor Mother] could…provide an explanation as to how G.M. could have sustained a head injury. [*Id.* at 31.] Ms. Ludwig also testified that Father did not identify anyone else who cared for G.M. when she sustained the head injury. [*Id.* at 32.] This CPS report was indicated and stated that G.M. sustained injuries consistent with child abuse while in the sole care of Mother and Father. [*Id.* at 32-34.]

Ms. Ludwig testified that Father had a history of substance use. [*Id.* at 38.] Ms. Ludwig further testified that[,] when she concluded her investigation, DHS had concerns regarding [the] safety and present danger to the Children in Mother's and Father's care. [*Id.* at 43-44.] Ms. Ludwig stated that due to these safety concerns[,] as well as G.M.'s unexplained injuries, it was in the best interests of [N.M.M. and M.M.] for DHS to obtain an OPC in order [to] ensure their safety. [*Id.* at 44.]

On cross-examination by the Child Advocate, Ms. Ludwig testified that she had concerns regarding reports of domestic violence between Mother and Father. [*Id.* at 46.] Ms. Ludwig further testified that neither parent was able to provide an explanation for how G.M. sustained the rib and head injuries. [*Id.* at 47.] When given the opportunity to cross-examine Ms. Ludwig, Father's Counsel stated that he did not have any questions. [*Id.* at 47.]

Counsel for DHS then called their next witness, acting Chief Medical Examiner for the Philadelphia Medical Examiner's Office, Dr. Albert Chu. [*Id.* at 62-126.] Dr. Chu testified that he is

currently employed at the Philadelphia Medical Examiner's Office ("M.E.") as the acting Chief Medical Examiner. [*Id.* at 63.] Dr. Chu testified that he has been employed by the Philadelphia M.E. since July 2014[,] and [he] has been the acting Chief Medical Examiner since August 2021. Prior to his current position, Dr. Chu was employed as the Deputy Chief Medical Examiner at the Philadelphia Medical Examiner's Office. Dr. Chu further testified that he specializes in forensic pathology and is certified by the American Board of Pathology in anatomic, clinical, and forensic pathology. [*Id.* at 63.] Dr. Chu also testified that he has been qualified as an expert in forensic pathology in a court of law over two hundred (200) times. [*Id.* at 64.] On cross-examination by Mother's Counsel, Dr. Chu testified that he was not certified as an expert in child abuse. [*Id.* at 67.] Th[e] [trial court] qualified Dr. Chu as an expert in forensic pathology. [*Id.*]

Dr. Chu testified that he was the direct supervisor for Dr. Lyndsey Emery, the assigned pathologist who performed G.M.'s autopsy. [*Id.* at 66, 69.] Dr. Chu stated that he was familiar with this case, and [he] also reviewed Dr. Emery's reports in preparation for the January 14, 2022, hearing. [*Id.* at 67.] Dr. Chu testified that his role as Dr. Emery's supervisor on this case was to provide guidance through conferences, assist in formulating a final opinion as to the cause and manner [of] death, [and]…to finalize and approve the autopsy report. [*Id.* at 69-70.] Dr. Chu stated that most of his recollection of this case stemmed from his review of Dr. Emery's Final Diagnosis Report in preparation for the January 14, 2022, hearing. [*Id.* at 71.] Dr. Chu testified that autopsy and final diagnosis reports are recorded at or near the time of the autopsy. [*Id.* at 71-72.] He testified that it is a regular practice of the Medical Examiner's office to generate autopsy and final diagnosis reports. [*Id.* at 72.] Dr. Chu further testified that these reports are recorded and kept in the regular course of business by the Medical Examiner's Office. Dr. Chu stated that a report of examination[,] as well as a report of final diagnosis[,] were generated at or near the time of G.M.'s autopsy[.] [*Id.* at 71-72.]

Dr. Chu testified that[,] while there were no acute injuries, evidence of prior injuries to G.M.'s head, brain, and ribs were found during G.M.'s autopsy. [*Id.* at 80.] Specifically, G.M.'s autopsy showed old subdural and subarachnoid hemorrhages[,] as well as an injury to the brain due to the interruption of blood flow. *Id.* Dr. Chu testified that there was also evidence of a healing rib fracture. *Id.* Dr. Chu specified that the head, brain,

and rib injuries did not occur immediately around the time of G.M.'s death. *Id.* Dr. Chu testified that neither routine CPR administered at the time of death, routine caregiving, nor co-sleeping with her twin would have caused G.M.'s rib fracture. [*Id.* at 84-85.] Dr. Chu also testified that based on her age G.M. could not have caused this injury to herself. Dr. Chu testified that G.M.'s rib injury was most consistent with inflicted trauma. [*Id.* at 86.] Dr. Chu could not make a conclusion as to the cause of G.M.'s brain injuries, stating that those types of injuries can occur in various ways, including from birth trauma, significant force inflicted to the head, shaking, or accidentally. [*Id.* at 90-94.] Dr. Chu further testified that there was no indication…that G.M. sustained any birth trauma that may have caused the brain injuries. [*Id.* at 92-94.]

Dr. Chu testified that the cause and manner of G.M.'s death was undetermined, but her death was not ruled as natural or accidental. [*Id.* at 95, 97.] Dr. Chu further testified that it was likely that G.M.'s injuries—specifically the rib fracture—were the result of abuse. [*Id.* at 97-98.] Dr. Chu testified that this finding was also included in the M.E. Final Diagnosis report regarding G.M. [*Id.* at 98.]

On cross-examination by the Child Advocate, Dr. Chu testified that the M.E. office found that G.M.'s brain injuries were blunt impact injuries. [*Id.* at 105.] Dr. Chu also gave his opinion that G.M.'s injuries may have been caused by forceful shaking of the head without impact. *Id.* at 91. Dr. Chu further testified that these types of injuries can be sustained due to a fall, car accident, or other traumatic incident, but that the M.E. office has no documentation that G.M. was ever involved in any traumatic incident. [*Id.* at 106-07.]

On cross-examination by Father's Counsel, Dr. Chu testified that there could be multiple potential causes for G.M.'s brain injuries. [*Id.* at 109-10.] Dr. Chu further testified that the M.E. reviewed G.M.'s birth and pediatrician records to determine if there was any evidence that G.M.'s brain injuries were caused by birth trauma or involvement in a traumatic incident or fall. [*Id.* at 110-11.] Dr. Chu testified that, to his knowledge, G.M.'s medical records did not show any evidence that G.M.'s brain injuries were caused by these alternative explanations. [*Id.* at 111.] Dr. Chu also testified that premature babies are more fragile than non-premature babies. [*Id.* at 112.]

On cross-examination by Mother's Counsel, Dr. Chu testified that he did not prepare a report for the January 14, 2022[,] hearing, but that he reviewed the M.E.'s records regarding this case prior to the hearing.  [*Id.* at 115.]  Dr. Chu stated that he reviewed the M.E. investigator's reports during the January 14, 2022[,] hearing.  [*Id.* at 118.]  Dr. Chu testified that he was not involved in G.M.'s autopsy nor did he review Dr. Emery's autopsy or final diagnosis reports contemporaneously.  [*Id.* at 119.]

On redirect examination, Dr. Chu testified that there was no medical documentation from the M.E. office to account for G.M.'s brain injuries nor was there any indication in G.M.'s primary care physician records that account for these injuries.  [*Id.* at 125.] Dr. Chu further testified there was no indication that G.M.'s premature birth caused G.M.'s rib fracture.  If the rib fracture had been birth-related, this injury would have been resolved by the time she was four-months old—G.M.'s age at the time of her death.  *Id.* at 122-25[.]

Mother's Counsel called [one] witness, current CUA Case Manager, Ms. Olivia Robinson.  [*Id.* at 128-39.]  Ms. Robinson stated that she was assigned this case on October 10, 2021.  [*Id.* at 128.]  On cross-examination, Ms. Robinson testified that she had safety concerns regarding Mother and Father due to G.M.'s unexplained injuries.  [*Id.* at 132.]  She further testified that the Children are currently placed in Kinship Care with their paternal grandmother.  [*Id.* at 132-33.]  When given the opportunity to cross-examine Ms. Robinson, Father's Counsel stated that he did not have any questions.  [*Id.* at 136.]

Following argument [by] counsel, on January 14, 2022, the [trial court entered an order finding] that there was clear and convincing evidence to adjudicate [N.M.M. and M.M.] dependent based on present inability and to find child abuse as to Father. [The trial court ordered N.M.M. and M.M. be removed from Mother's and Father's home and continued placement by DHS in Kinship Care through Turning Points with paternal grandmother.] [The trial court] also [entered an order finding] that clear and convincing evidence was presented to make a finding of aggravated circumstances as to Father.[3]

_____

[3] Based on the testimony indicating that both parents were the primary caregivers of G.M., N.M.M., and M.M. at the time G.M.'s injuries were inflicted,
*(Footnote Continued Next Page)*

Father timely filed notices of appeal and a Concise Statements of Errors Complained of on Appeal on January 27, 2022, and an amended Concise Statement…on February 13, 2022. [This Court consolidated the appeals.]

Trial Court Opinion filed 3/4/22, at 2-10 (footnotes omitted) (footnotes added).

On appeal, Father sets forth the following issues in his "Statement of the Questions Involved" (verbatim):

1. Whether the trial court erred in determining the evidence to have been sufficient to substantiate the finding of child abuse?

2. Consequently, whether the trial court erred in arriving at an adjudication of dependency?

3. Additionally, then, whether the trial court erred in the removal of [the Children] from [Father's] home and placement into the custody of the Agency?

4. Lastly, whether the trial court erred in determining there to have been a finding of Aggravated Circumstances, in that the evidence being insufficient to establish [Father] having perpetrated serious bodily injury?

5. Whether there that [*sic*] the trial court erred in admitting into evidence the testimony of DHS Supervisor Ludwig, specifically with respect to several out of court declarations in the form of opinion having been referenced by way of Agency Exhibits No's. 1, 2, 3, and 7; and moreover, with those thoughts having been articulated through conclusory language.

6. Additionally, the testimony of DHS Supervisor Ludwig concerning the Report of Child Abuse as having been "Indicated."

7. And, finally, whether the trial court erred in admitting into evidence the aforementioned Agency Exhibit No's. 1, 2, 3, 4,

---

the trial court also entered an order finding Mother to be a perpetrator of child abuse. The trial court also entered an order finding aggravated circumstances as to Mother.

and 7; with those Exhibits having been repleat [*sic*] with out of court statements of opinion, as well as Exhibit No's. 2 and 4 also expressing the Report to have been "Indicated."

Father's Brief at 6 (footnote omitted).

Father's first, second, third, and fourth issues are related. He challenges the trial court's finding that G.M. was a victim of child abuse and Father was a perpetrator of the child abuse as provided for under the CPSL.[4] He further contends that, absent sufficient evidence that G.M. was a victim of child abuse and/or that Father was the perpetrator of the child abuse, the trial court's dependency determination as to N.M.M. and M.M. is erroneous, as is the trial court's finding that aggravated circumstances existed. Father further challenges the trial court's dependency disposition of removing N.M.M. and M.M. from Father's home and placing them in Kinship Care.

The Pennsylvania Supreme Court has set forth our standard of review for dependency cases as follows:

> The standard of review in dependency cases requires an appellate court to accept findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the [trial] court's inferences or conclusions of law. We review for abuse of discretion[.]

***In the Interest of L.Z.***, 631 Pa. 343, 111 A.3d 1164, 1174 (2015) (quotation marks and quotation omitted).

_____

[4] Child Protective Services Law ("CPSL"), 23 Pa.C.S.A. §§ 6301-6387.

Where, as in the case *sub judice*, the trial court deems parents to be perpetrators of child abuse under the CPSL, we note that "[although] dependency proceedings are governed by the Juvenile Act[5]…the CPSL controls determinations regarding findings of child abuse, which the [trial] courts must find by clear and convincing evidence."[6] ***In the Interest of L.V.***, 209 A.3d 399, 417 (Pa.Super. 2019) (citations and footnotes omitted) (footnote added). "[T]he [Juvenile] Act and the [CPSL] must be applied together in the resolution of child abuse complaints under the [CPSL and] reference must be made to the definition sections of both the [Juvenile Act] and the [CPSL] to determine how that finding [of child abuse] is interrelated." ***In the Interest of J.R.W.***, 631 A.2d 1019, 1023 (Pa.Super. 1993).

"As part of [a] dependency adjudication, a court may find a parent…to be the perpetrator of child abuse[ ] as defined by the…CPSL." ***In the Interest of S.L.***, 202 A.3d 723, 728 (Pa.Super. 2019) (quotation marks and quotations omitted). Under the CPSL, "child abuse" is defined as "intentionally, knowingly, or recklessly doing" one of many acts, including causing bodily

---

[5] Pennsylvania Juvenile Act ("Juvenile Act"), 42 Pa.C.S.A. §§ 6301-6375.

[6] "Clear and convincing evidence" is defined as evidence that is "so clear, direct, weighty[,] and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." ***In the Interest of C.S.***, 761 A.2d 1197, 1201 (Pa.Super. 2000) (*en banc*) (quotation marks and quotation omitted).

injury[7] to a child through any recent act or failure to act.[8] ***See*** 23 Pa.C.S.A. § 6303(b.1) (defining "child abuse").

Recently, in ***In the Interest of C.B.***, 264 A.3d 761 (Pa.Super. 2021) (*en banc*), this Court relevantly set forth the following:

> Section 6381 of the CPSL, which governs evidence in court proceedings, states that "[i]n addition to the rules of evidence…relating to juvenile matters, the rules of evidence in this section **shall govern** in child abuse proceedings in court[.]" 23 Pa.C.S.A. § 6381(a). Specifically,
>
> Section 6381(d)]provides for an 'attenuated' standard of evidence in making a legal determination as to the abuser in child abuse cases [where] a child has suffered serious physical injury...as would ordinarily not be sustained or exist except by reason of the acts or omissions of the parent or other person responsible for the welfare of the child. [***In the Interest of J.R.W.***, 631 A.2d at 1023 (quotation marks and quotation omitted). ***See*** 23 Pa.C.S.A. § 6381(d).]
>
> In ***In the Interest of N.B.-A.***, ____ Pa. ____, 224 A.3d 661 (2020), the Pennsylvania Supreme Court rather recently

---

[7] The CPSL defines "bodily injury" as "[i]mpairment of physical condition or substantial pain." 23 Pa.C.S.A. § 6303(b.1) (defining "bodily injury").

[8] In ***In the Interest of C.B.***, 264 A.3d 761, 773 (Pa.Super. 2021) (*en banc*), this Court held that a trial court's culpability determination as to whether the child abuse was intentional, knowing, or reckless is "superfluous." We held:
> Under Section 6381 of the CPSL, a petitioning party is not required to establish that the parent or caregiver perpetrated the abuse "intentionally, knowingly, or recklessly." Rather, in Section 6381 cases, "the fact of abuse suffices to establish *prima facie* evidence of abuse by the parent or person responsible," permitting petitioners to "prove their case with only the physical evidence of injuries that would not ordinarily be sustained but for the action [or inaction] of the parents or responsible person and the implausible statements of the parents and responsible persons."

***Id.*** (quotation and citations omitted).

reiterated the appropriate standard of proof for a finding of child abuse:

> The requisite standard of proof for a finding of child abuse pursuant to Section 6303(b.1) of the CPSL is clear and convincing evidence. [A] petitioning party must demonstrate the existence of child abuse by the clear and convincing evidence standard applicable to most dependency determinations, 42 Pa.C.S.[A.] § 6341(c)[]….**However, in certain situations, the identity of the abuser need only be established through *prima facie*[9] evidence.** As an appellate court, we are required to accept the findings of fact and credibility determinations of the trial court, if they are supported by the record; however, [an appellate] court is not bound by the [trial] court's inferences or conclusions of law.

***Id.*** at 668 (citation omitted).

\*\*\*

Section 6381(d) of the CPSL, found under the subchapter titled "**Miscellaneous Provisions**," establishes a rebuttable, evidentiary presumption when a child sustains abuse not ordinarily suffered absent acts or omissions of a parent or other responsible party. Under such circumstances, "the fact of abuse suffices to establish *prima facie* evidence of abuse by the parent or person responsible." ***In the Interest of L.Z.***, 631 Pa. 343, 111 A.3d 1164, 1167 (2015).

To aid the [trial court] in determining whether a child has been abused, "the Legislature deemed it wise and necessary to establish a different evidentiary standard for finding child abuse by a parent or person responsible for the child's care, one in contrast to the overall standard for determining dependency under the Act." ***Id.*** The ***J.R.W.*** Court recognized:

---

[9] *Prima facie* evidence is "[s]uch evidence as, in the judgment of the law, is sufficient to establish a given fact, or the group or chain of facts constituting the party's claim or defense, and which if not rebutted or contradicted, will remain sufficient." ***In the Interest of L.Z.***, ***supra***, 111 A.3d at 1184 (citation omitted).

- 13 -

> **This lessened standard of establishing abuse by the caretakers** [under Section 6381(d)], **coupled with the clear and convincing evidence necessary to find dependency, has been imposed by the Legislature as the standard which the [trial court] must apply in deciding abuse cases.** *Prima facie* evidence is not the standard that establishes the child has been abused, which must be established by clear and convincing evidence; it is the standard by which the court determines whom the abuser would be in a given case. There is no conflict, constitutional or otherwise, with the clear and convincing evidence standard imposed by the Act to establish child abuse. **The Legislature has determined that the likelihood clearly established abuse has occurred, other than at the hands of the custodian, is so small that *prima facie* evidence the custodian has caused the injury, either by acts or omissions, is all that is required.** We find no defect in this reasoning. Such a standard provides maximum protection for the child victim or other children in the community who might be subject to similar abuse if the alleged abuser was not identified and permitted free access to the victim or other vulnerable children. It is not equivalent to a finding of guilt in a criminal proceeding which could result in deprivation of freedom. Thus[,] the [L]egislature has balanced the needs of society and children for protection against the abuser's possible patterned behavior and his/her right to freedom unless found guilty beyond a reasonable doubt.

*Id.* at 1024. ***See*** [***In the Interest of***] ***L.Z.***, [*supra*,] 111 A.3d at 1184 ("The Legislature, however, carved out a very limited exception to these more stringent evidentiary standards, allowing for the possibility of identifying the perpetrator of abuse based on *prima facie* evidence in cases where the abuse is "of such a nature as would ordinarily not be sustained or exist except by reason of the acts or omissions of the parent[.]").

Under Section 6381(d), a parent or other responsible caregiver may rebut the *prima facie* presumption with evidence:

> [d]emonstrating that the parent or responsible person did not inflict the abuse, potentially by testifying that

they gave responsibility for the child to another person about whom they had no reason to fear or perhaps that the injuries were accidental rather than abusive. The evaluation of the validity of the presumption would then rest with the trial court evaluating the credibility of the *prima facie* evidence presented by...[DHS]…and the rebuttal of the parent or responsible person.

[*In the Interest of*] *L.Z.*, [*supra*,] 111 A.3d at 1185….A parent does not actually have to be physically present with the child at the time of the abuse for the presumption to apply to that parent. *Id.* at 1185-86.

*In the Interest of C.B.*, 264 A.3d at 770-73 (emphasis omitted) (bold in original) (footnotes omitted) (footnote added) (quotation and citations omitted).

In addressing Father's claim that the evidence insufficiently established that G.M. was the victim of child abuse and Father was the perpetrator of the abuse, the trial court relevantly indicated the following:

[The trial court] determined that…child abuse was supported by clear and convincing evidence. [The trial court] heard credible testimony from DHS Supervisor, Ms. Michelle Ludwig, that the Children's welfare and safety were at risk in Father's care. Ms. Ludwig testified that in June 2020, DHS received a GPS report alleging that the Children's sibling, G.M., passed away. At the time of the June 2020 [CPS] report, In-Home Services had already been implemented after N.M.M. tested positive for marijuana at birth. Following the June 2020 [CPS] report, Ms. Ludwig testified that DHS received two (2) CPS reports on November 25, 2020, and February 5, 2021, containing allegations of child abuse in connection to G.M.'s death. Specifically, the November 25, 2020, CPS report alleged that G.M. sustained a healing rib fracture consistent with child abuse. The February 5, 2021, [CPS] report alleged that G.M. also sustained head and brain trauma prior to her death. Both CPS reports indicated Mother and Father as the perpetrators of abuse of the victim child, G.M.

- 15 -

Ms. Ludwig further testified that, throughout her investigation, Father was never able to provide an explanation for how G.M. sustained the injuries. Ms. Ludwig further testified that Mother and Father were the primary caregivers for G.M., and no other caregivers were identified for G.M. Ms. Ludwig stated that, when she concluded her investigation, DHS had active safety concerns for [N.M.M. and M.M.] based on G.M.'s indicated and unexplained injuries, and that removal from Mother's and Father's care was necessary to ensure the Children's safety and well-being. Current CUA Case Manager, Ms. Olivia Robinson, also expressed present safety concerns for the Children in Mother's and Father's care given G.M.'s unexplained injuries.

Ms. Ludwig's testimony was corroborated by Acting Chief Medical Examiner, Dr. Albert Chu. Dr. Chu testified that G.M.'s autopsy revealed evidence of a healing rib fracture, which likely occurred "a few weeks" prior to her death. Dr. Chu credibly testified that neither G.M.'s premature birth, CPR administered at the time of death, nor co-sleeping with her twin could have caused this type of injury. Dr. Chu also testified that, based on G.M.'s age, this injury could not have been self-inflicted. Dr. Chu testified that G.M.'s rib injury was most consistent with inflicted trauma. Dr. Chu further testified that G.M.'s autopsy also revealed old head and brain injuries. Dr. Chu described the various ways this type of brain injury can occur, including birth trauma, blunt force trauma, shaking, or due to a fall, car accident, or other traumatic incident. Dr. Chu testified that the M.E. has no medical documentation to account for G.M.'s brain injuries. However, Dr. Chu further testified that there was no indication of any birth trauma, which may have caused the brain injuries, and [the] M.E. has no documentation that G.M. was involved in a fall, car accident, or other traumatic incident. Dr. Chu also testified that the M.E. office found that G.M.'s brain injuries were blunt impact injuries.

G.M.'s rib fracture and brain injuries sustained prior to her death greatly concern [the trial court]. The indicated CPS reports from November 25, 2020, and February 5, 2021, stated that G.M. sustained injuries consistent with child abuse while in the primary care of Mother and Father. Additionally, Father [has been unable] to provide a plausible explanation for the cause of G.M.'s injuries….Dr. Chu testified that CPR administered at the time of death could not have caused G.M.'s rib fracture because it was a healing injury, which likely occurred a "few weeks" prior to her death. Dr. Chu also testified that, because G.M. was four months

- 16 -

old at the time of her death, she could not have caused this type of injury to herself, nor could the injury have been caused by co-sleeping with her twin. Dr. Chu provided credible testimony that G.M.'s rib fracture was likely caused by abuse. Although Dr. Chu could not provide a definitive explanation for how G.M. sustained the head and brain injuries, he testified that there was no evidence that these injuries were caused by birth trauma or involvement in a traumatic accident. While the cause and manner of G.M.'s death were undetermined, her death was not ruled natural or accidental. The testimony also reflected outstanding dependency issues regarding a history of substance use and domestic violence. Father's inability to provide an explanation for how G.M. was seriously injured and later died in his care is evidence of dependency[,] child abuse[,] [and remains a barrier to reunification with N.M.M. and M.M. at this time].

[B]ecause the trial court determined that G.M. was the victim of child abuse, it did not abuse its discretion in finding that the Children also lacked proper parental care and control by Father. While [N.M.M. and M.M.] did not suffer any injuries, Father's acts or omissions regarding the abuse of G.M. placed the Children's health, safety, and welfare at risk.

After hearing the evidence presented, the trial court found that DHS had shown by clear and convincing evidence that the Children were dependent and without proper parental care. Proper parental care was not immediately available due to the injuries G.M. sustained while in Mother's and Father's care[,] and Father's inability to provide a plausible explanation for the injuries.

\*\*\*

[W]hile the petitioning party in a dependency action must demonstrate the existence of child abuse by clear and convincing evidence, the identity of the abuser need only be established by *prima facie* evidence. Under Section 6381, the fact of abuse is sufficient [to] establish *prima facie* evidence of abuse by the parent or person responsible for the child's welfare….Specifically, the CPSL establishes the following rebuttable evidentiary presumption for finding child abuse by a parent or person responsible for the Child's care:

> Evidence that a child has suffered child abuse of such a nature as would ordinarily not be sustained or exist except by reason on the acts or omissions of the parent or other person responsible for the welfare of the child shall be *prima facie* evidence of child abuse

- 17 -

> by the parent or other person responsible for the welfare of the child.

23 Pa.C.S.A. § 6381(d).

***

Applying 23 Pa.C.S.A. § 6381(d) and the relevant law to this case, the [trial court] properly determined that Father was the perpetrator of the abuse. The victim child, G.M., was in the primary care and control of only Mother and Father during the time the injuries were discovered. Additionally, medical evidence from G.M.'s autopsy demonstrated that the injuries sustained were "of such a nature as would not ordinarily be sustained or exist except by reason of the acts or omissions of the parent." 23 Pa.C.S.A. § 6381(d). Specifically, the two indicated CPS reports from November 25, 2020, and February 5, 2021, stated that G.M.'s injuries were consistent with child abuse. Mother and Father were the named perpetrators of abuse on the indicated CPS reports. Dr. Chu testified that G.M.'s rib injury was most consistent with inflicted trauma from abuse. The M.E. found that G.M.'s brain injuries were blunt impact injuries. While the cause and manner of G.M.'s death were "undetermined," G.M.'s death was not ruled natural or accidental.

Based on…the rebuttable presumption defined in 23 Pa.C.S.A. § 6381(d), [the trial court] properly determined that *prima facie* evidence existed to determine that Father was the perpetrator of abuse. Father has been unable to provide an explanation as to how G.M. could have sustained the rib fracture and brain injuries. The evidence clearly established that Mother and Father were the primary caregivers for G.M. at the time of her death and that G.M.'s injuries occurred while G.M. was in their care. G.M. sustained injuries of such a nature that would not ordinarily be sustained but for the acts or omissions of the person responsible for the welfare of the child. While [the trial court] was unable to determine which parent perpetrated the abuse, it properly found that Father perpetrated the abuse by omission even if he did not inflict any of the injuries. [The trial court] also properly determined that Father failed to rebut the evidentiary presumption in Section 6381(d) by failing to present evidence establishing that G.M. was not in his care when the injuries occurred, or that he had no reason to believe that G.M. would be unsafe in Mother's care.

Trial Court Opinion, filed 3/4/22, at 14-20 (citations and footnote omitted).

We find no abuse of discretion or error of law in the trial court's reasoning. Specifically, contrary to Father's argument, we agree with the trial court that DHS established by clear and convincing evidence that G.M. was a victim of "child abuse" as defined by the CPSL. Medical testimony established that the four-month-old infant, G.M., suffered rib, head, and brain injuries, which were the result of non-accidental trauma that occurred while Father was responsible for G.M.'s welfare. **See In the Interest of C.B.**, **supra**. Moreover, Father could not provide an explanation of how the injuries occurred.

Under these facts, the trial court properly applied the evidentiary presumption found at 23 Pa.C.S.A. § 6381(d), which establishes a *prima facie* case of abuse by the persons who were responsible for the child when the abuse occurred, and properly found Father failed to rebut this presumption. **See In the Interest of C.B.**, **supra**.[10]

_____

[10] Similar to the case *sub judice*, in **In the Interest of C.B.**, **supra**, DHS established, by clear and convincing evidence, that a five-month-old infant suffered injuries that were neither accidental nor self-inflicted and were of such a nature that they would not ordinarily be sustained except by reason of the acts or omission of the parent or other person responsible for the infant's welfare. This Court held the trial court properly found the infant was the victim of "child abuse" as defined by the CPSL. **Id.** at 776. We further held the trial court properly applied the Section 6381(d) presumption since the parents were the primary caretakers of the infant, and the parents failed to rebut the presumption by establishing the infant was not in their care when he suffered his injuries. **See id.**

As this Court has held, the rebuttable presumption is necessary to ensure the safety of a child (and the child's siblings) when the child has been under her parents' care, has been abused, and the identity of the perpetrator cannot be established. *See id.*

> In essence, [the rebuttable presumption] forces caregivers either to come forward with the identity of the perpetrator of abuse or be assigned fault where it was their responsibility to care for the child and keep the child safe. As emphasized by our Supreme Court…"when a child is in the care of multiple parents or other persons responsible for care, those individuals are accountable for the care and protection of the child whether they actually inflicted the injury or failed in their duty to protect the child."

*In the interest of C.B.*, 264 A.3d at 778 (quoting *In the Interest of L.Z.*, *supra*, 111 A.3d at 1185) (citation omitted).

Accordingly, for all of the aforementioned reasons, we conclude the trial court properly found that Father was a perpetrator of child abuse under Section 6381(d).

Regarding Father's challenge to the trial court's adjudication of N.M.M. and M.M. as dependent, he claims that, since G.M. was not a victim of child abuse and/or Father was not a perpetrator of the abuse, the trial court's dependency determination is erroneous. However, having found Father was a perpetrator of abuse as to G.M., we find his issue challenging the trial court's adjudication of dependency as to N.M.M. and M.M. moot. **See In the Interest of C.B.**, **supra** (finding moot the parents' challenge to trial court's adjudication of dependency as to multiple children where trial court found parents perpetrators of abuse as to one child); **In the Interest of R.P.**, 957

A.2d 1205, 1213 (Pa.Super. 2008) (stating where trial court finds one sibling abused, court may determine other siblings dependent, even if they have not been abused).

Regarding Father's averment that, after the trial court adjudicated N.M.M. and M.M. dependent, the trial court erred in its disposition of placing the Children in the custody of DHS and Kinship Care, we disagree.[11] Father argues the trial court erred since its determination was made based on an erroneous finding that G.M. suffered abuse and Father was a perpetrator of the abuse. However, as indicated *supra*, we hold the trial court did not err in its finding of child abuse perpetrated by Father. Thus, Father is not entitled to relief on this claim. ***See In the Interest of R.P.***, ***supra***.

In his next issue, Father contends the trial court erred in holding that aggravated circumstances existed as to Father. Specifically, he avers that, since there was no evidence G.M. suffered abuse and/or that Father was a perpetrator of the abuse, the trial court also erred in finding that aggravated circumstances existed as to Father. However, as indicated *supra*, we hold the

---

[11] If the court finds that a child is dependent, then the court may make an appropriate disposition of the child to protect the child's physical, mental and moral welfare, including allowing the child to remain with the parents subject to supervision, transferring temporary legal custody to a relative or public agency, or transferring custody to the juvenile court of another state. 42 Pa.C.S.A. § 6351(a). ***In re D.A.***, 801 A.2d 614 (Pa.Super. 2002) (*en banc*), Here, the trial court determined it was in the best interest of N.M.M. and M.M. to remove them from their parents' care and place them with paternal grandmother through Kinship Care.

- 21 -

trial court did not err in its finding of child abuse perpetrated by Father.  Thus,

Father is not entitled to relief on this claim.[12]  *See In the Interest of R.P.*,

*supra*.

Father next contends the trial court erred in permitting Michelle Ludwig,

a DHS supervisor, to offer inadmissible hearsay testimony.[13]  Father contends:

_____

[12] If the trial court adjudicates a child dependent, and either the county agency or the child's attorney has alleged aggravated circumstances exist, the court must then determine the veracity of those allegations.  *See* 42 Pa.C.S.A. §§ 6341(c.1), 6351(e)(2).  If the court finds by clear and convincing evidence that aggravated circumstances do exist, it must consider whether reasonable efforts to prevent or eliminate the need to remove the child or to preserve and reunify the family should be made or continue to be made.  *See id.*

In the case *sub judice*, the trial court found "aggravated circumstances" existed under the following circumstances:

> (2) The child or another child of the parent has been the victim of physical abuse resulting in serious bodily injury, sexual violence or aggravated physical neglect by the parent.

42 Pa.C.S.A. § 6302(2) (defining "aggravated circumstances"). The trial court directed efforts shall continue to be made to preserve the family and reunify N.M.M. and M.M. with Mother and Father.

[13] We have held:

> Questions concerning the admissibility of evidence are within the sound discretion of the trial court[,] and we will not reverse a trial court's decision concerning admissibility of evidence absent an abuse of the trial court's discretion. An abuse of discretion is not merely an error of judgment[ but, rather, is] the overriding or misapplication of the law, or the exercise of judgment[,] that is manifestly unreasonable, or the result of bias, prejudice, ill-will[,] or partiality, as shown by the evidence of record. If in reaching a conclusion the trial court overrides or misapplies the law, discretion is then abused[,] and it is the duty of the appellate court to correct the error.

*Commonwealth v. LeClair*, 236 A.3d 71, 78 (Pa.Super. 2020) (citation omitted).

"As a general rule Hearsay (pursuant to exceptions) has been, and always is regarded as inadmissible. Here, the testimony of DHS supervisor Ludwig contained within [it] a number of references to matters it would be professed to have been made of court." Father's Brief at 21 (citing Pa.R.E. 802).

Father then lists in his brief references to the following bolded portions of Ms. Ludwig's direct examination by DHS's counsel:

> Q: What did you do when your team received the GPS report in June of 2020?
>
> ***
>
> A: For the GPS report in June, at that point it was ruled that preliminarily there were injuries noted. However, they could not rule out—there was a rib fracture, and we could not rule out that it was not caused in transport or in CPR, so at that time, the GPS report was invalid as there was no other signs that were—the autopsy was not completed yet[.]
>
> Q: Okay. Did you receive any additional…reports for this family?
>
> A: Yes. We did.
>
> Q: When did you receive your next reports?
>
> A: November 25, 2020.
>
> Q: And what type of report was this?
>
> **A: So that was a CPS report for serious physical injury, noting that [G.M.], in completing—in halfway completing the autopsy report, that she had a rib fracture that was consistent with child abuse.**
>
> [MOTHER'S COUNSEL]: Objection. Move to strike.
>
> [FATHER'S COUNSEL]: Objection. Objection—move…I would support the objection of [Mother's counsel].
>
> [MOTHER'S COUNSEL]: It calls for a—it calls for [a] medical conclusion. Your Honor, and that's the basis of the—my initial in— or initial discussion with the Court. I do not find that this witness is capable of testifying to medical conditions.
>
> THE COURT: Overruled.

- 23 -

***

Q: I'm showing you what's marked as DHS Exhibit 2. Do you recognize this document?

A: I do.

Q: And what is the document?

A: It's CY-48.

Q: And what is a CY-48?

A: This is the report that is sent back to the state with the determination of findings for the investigations that we've completed.

Q: Okay. An [*sic*] in particular—so this document, does your name appear on this document?

A: It does on page 3.

Q: Okay. And as a supervisor for an investigation, do you complete or assist the worker to—to complete this form?

A: Yes.

Q: Okay. And specifically, as it relates to this document on page 2, what is the outcome explanation that you submitted to the state?

A: The outcome explanation—

[FATHER'S COUNSEL]: Again, objection.

THE COURT: Basis, counsel?

[FATHER'S COUNSEL]: It's—it's hearsay. The…witness here has no personal knowledge of—of the conclusion…Again,…based on my objection is if the investigator has no direct knowledge of—of what she—what the investigator is drawing her conclusion from. It's clearly a medical determination. We will be hearing from the doctor. And that would be the basis for my objection.

THE COURT: Overruled. [DHS's Counsel], please proceed.

[DHS'S COUNSEL]: Thank you.

Q: On page 2 of [CY-48] that you submitted to the state, please?

**[A]: "CPS" report is indicated on both mother and father. Victim child suffered a posterior third rib fracture**

- 24 -

**that is the cause of trauma and consistent with child abuse neither---according to Dr. Emery—neither Mother—sorry— neither Mother nor Father could explain the injuries to the child when asked."**

Q: Thank you.

\*\*\*

Q: Okay. And on page 2, can you please state the outcome that was submitted to the state regarding this report?

A: Sure.  CPS report [w]as indicated as child has injuries that are consistent with trauma or child abuse. The—

[FATHER'S COUNSEL]: Again, I—I want—objection to the testimony and—

THE COURT: Overruled.

**A: The MEO reviewed medical records to ensure the injuries ere noted from birth or her—victim child's extensive stay in NICU after birth.  Child was also born vaginally and—and was baby B of twin girls.  There's no noted trauma from birth.  The Mother and Father were the sole caregivers of the victim and cannot explain the injuries.  The child was not old enough for the injuries to be considered accidental. The injuries cannot be ruled to—to the cause of death to the child; however, they are consistent with trauma and child abuse.**

N.T., 1/14/22, at 16-17, 24-27, 33-34 (bold added).[14]  _**See**_ Father's Brief at 21-22.

_____

[14] Father also challenges on appeal the following bolded portion of Ms. Ludwig's direct examination on the basis it was inadmissible hearsay:

**Q: And who were the perpetrators that DHS determined to have caused this abuse?**
**A: Mother and Father.**
Q: And who was the victim child?
A: [G.M.]
[DHS's COUNSEL]: Your Honor, may I approach the witness?

_(Footnote Continued Next Page)_

Initially, we note that, in developing his two-page argument on appeal, Father provides the list of excerpts *supra* from Ms. Ludwig's direct examination and baldly claims the testimony is hearsay. He then suggests that, since the testimony is hearsay, we must reverse the trial court's orders finding child abuse perpetrated by Father since such orders may not be based materially on hearsay alone. ***See*** Father's Brief at 22 (citing ***AY v. Com., Dept. of Public Welfare***, 537 Pa. 116, 641 A.2d 1148 (1994)).

However, aside from Father's conclusory contention that the aforementioned excerpts of testimony are inadmissible hearsay, Father has

---

THE COURT: You may.
N.T., 1/14/22, at 24 (bold added). ***See*** Father's Brief at 21.
　　　As is evident, Father did not lodge an objection to this testimony at trial, and therefore, his appellate challenge based thereon is waived. ***See*** Pa.R.A.P. 302(a) ("Issues not raised in the trial court are waived and cannot be raised for the first time on appeal."). In any event, Father cannot demonstrate that he was prejudiced by this specific excerpt of testimony since Ms. Ludwig testified several times, without objection, that G.M. was the victim of child abuse and Father/Mother were the alleged perpetrators of the abuse. ***See*** N.T., 1/14/22, at 19 (Ms. Ludwig testified G.M. was the victim child of the CPS report and Father/Mother were the alleged perpetrators); at 29 (same); at 30 (same); at 31-32 (Ms. Ludwig testified neither Mother nor Father offered an explanation for G.M.'s head trauma, and neither parent indicated anyone else who may have been caring for G.M. as it relates to this particular injury). ***See generally In re A.J.R.-H***, 647 Pa. 256, 188 A.3d 1157 (2018) (holding where, in light of the record as a whole, an erroneous evidentiary ruling could not potentially have affected the decision to terminate a parent's rights to his or her child, an error is harmless and the parent is not entitled to a new hearing; holding harmless error doctrine may be applied by a reviewing court if the established facts support a legal conclusion producing the same outcome).

not developed his claim. That is, Father baldly claims the testimony is hearsay without any discussion of the relevant hearsay rules or exceptions thereto.

It is well-settled that the failure to develop an adequate argument in an appellate brief may result in waiver of the claim under Pa.R.A.P. 2119. **Commonwealth v. Beshore**, 916 A.2d 1128, 1140 (Pa.Super. 2007) (*en banc*) (citation omitted). "[A]rguments which are not appropriately developed are waived." **Lackner v. Glosser**, 892 A.2d 21, 29–30 (Pa.Super. 2006) (citations omitted). "When issues are not properly raised and developed in briefs, or when the briefs are wholly inadequate to present specific issues for review, a Court will not consider the merits thereof." **Commonwealth v. Maris,** 629 A.2d 1014, 1017 (Pa.Super. 1993).

Here, Father's mere listing of excerpts from Ms. Ludwig's testimony and baldly contending the excerpts constitute inadmissible hearsay without appropriate discussion of relevant authority, precludes us from conducting meaningful appellate review of his claim. **In re W.H.**, 25 A.3d 330, 339 n.3 (Pa.Super. 2011) ("[W]here an appellate brief fails to provide any discussion of a claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review that claim is waived."). Thus, we find Father's issue to be waived.

In any event, we note the portions of Ms. Ludwig's testimony to which Father refers are cumulative of the extensive expert testimony offered by Chief Medical Examiner Dr. Albert Chu, whose testimony Father does not

challenge on appeal. *See* N.T., 1/14/22, at 63-124 (Dr. Chu testified G.M. sustained a rib fracture and opined to a reasonable degree of medical certainty the injury resulted from trauma and abuse; there are no medical records indicating the injuries sustained by G.M. were birth related; the injuries were not accidental and G.M. was too young to cause the injuries to herself).

Moreover, the portions of Ms. Ludwig's challenged testimony relating to Father and Mother being unable to explain G.M.'s injuries, as well as being the caregivers to G.M., is cumulative of the testimony offered by the CUA case manager, Olivia Robinson,[15] as well as numerous unobjected to portions of Ms. Ludwig's testimony. *Id.* at 132 (Ms. Robinson admitted she had concerns for N.M.M. and M.M. since G.M. was injured while in her parents' care and parents were unable to provide an explanation); at 16 (Ms. Ludwig testified, without objection, that G.M., M.M., and N.M.M. were in the care of Mother and Father in June of 2020); at 21-22 (Ms. Ludwig testified, without objection, that neither Mother nor Father provided an explanation during the investigation as to how G.M. sustained her rib injury); at 23 (Ms. Ludwig testified, without objection, that, aside from Mother and Father, there were no other caregivers identified for G.M.); at 31-32 (Ms. Ludwig testified, without objection, that neither Mother nor Father offered an explanation for G.M.'s head trauma, and neither parent indicated anyone else who may have

_____

[15] We note Ms. Robinson was called as a witness by Mother.

been caring for G.M. as it relates to this particular injury). Thus, we conclude the trial court's challenged rulings as to Ms. Ludwig's testimony was, at most, harmless error in the context of the court's determinations. *See In re A.J.R.-H*, *supra*.

Father next challenges Ms. Ludwig's testimony that the determination of various reports, including the CPS reports, were "Indicated." Father's entire appellate argument in this regard is as follows:

> The testimony regarding the reports having been "Indicated" it is maintained would have constituted inadmissible hearsay, having been created from an [*sic*] out of court source. Notwithstanding, [Father] would submit any consideration of the characterization (as to a report having been indicated) as being confined to merely opinion only, and not be viewed as dispositive.

Father's Brief at 22-23.

We find this issue to be waived. Father has failed to develop an adequate argument with citation to, or discussion of, proper authority. *See Beshore*, *supra*; *Lackner*, *supra*. His failure to develop the argument prevents meaningful appellate review, and thus, we decline to address this claim further. *See Maris*, *supra*.

In his final claim, Father contends the trial court erred in admitting into evidence unredacted DHS Exhibit Numbers 1, 2, 3, 4, and 7. Specifically, he challenges the following portions of the Exhibits (verbatim):

> Exhibit 1 pg. 5 (middle) "…old healing rib fracture and based on the area of the rib fracture, it is consistent with child abuse." Exhibit 2 pg. 2 "…posterior 3rd rib fracture that is the cause of trauma and consistent with child abuse according to Dr. Emery." Exhibit 3 pg. 1 (middle) "…the rib fracture is for sure abuse…only

explanation for head injury as being inflicted trauma…" Exhibit 4 pg. 2 "CPS report is indicated at [*sic*] child has injuries that are consistent with trauma or child abuse…Child was not old enough for the injuries to be considred [*sic*] accidental." Exhibit 7 pg. 2 "…As such, non-accidental head trauma is favored, although the precise mechanism cannot be determined. In addition, the presence of a healing posterior rib fracture, occurring approximately two to three weeks prior to her death, ia [*sic*] a harbinger of abusive injury (occurring at a separate time from the head injuries)."

Father's Brief at 23-24.

Aside from listing the above excerpts from the Exhibits, Father's entire appellate argument is as follows (verbatim):

It is well understood that Hospital/Medical records may be admissible into evidence pursuant to the Business Records Exception. ***See*** 225 Pa.C.S. section 803(6). However, relying on the Autopsy Report alone without having called the Medical Examiner to testify constituted reversible error. ***Commonwealth v. McCloud***, [457 Pa. 310], 322 A.2d 653 (1974).[16] ***See also Commonwealth v. Carter***, 861 A.2d 957 ([Pa.Super.] 2004)[17]– standing for the principle that opinions, diagnoses and conclusions contained in hospital or medical records are not admissible under the business records exception.

\*\*\*

---

[16] In ***McCloud***, our Supreme Court held "that in a homicide prosecution, evidentiary use, as a business records exception to the hearsay rule, of an autopsy report in proving legal causation is impermissible unless the accused is afforded the opportunity to confront and cross-examine the medical examiner who performed the autopsy, absent a compelling necessity." ***McCloud***, ***supra***, 322 A.2d at 656-57.

[17] We note that this Court's opinion in ***Commonwealth v. Carter***, 861 A.2d 957 (Pa.Super. 2004), to which Father cites, was reversed by our Supreme Court in ***Commonwealth v. Carter***, 593 Pa. 562, 932 A.2d 1261 (2007), which held that a police crime lab report fell within the business record exception to the hearsay rule.

All of these [listed portions of the Exhibits] it is submitted would have fallen within the realm of medical opinion; and thus, [Father] would aver them to have been inadmissible.

Father's Brief at 23-24 (footnotes added).

Preliminarily, we note that Father has not identified the type of Exhibits at issue. In any event, we note that Exhibit 1 is a CPS report dated 11/25/20, Exhibit 2 is a CPS Investigation Report, Exhibit 3 is a CPS report dated 2/5/21, Exhibit 4 is a CPS Investigation Report, and Exhibit 7 is the medical examiner's autopsy reports.

As is evident from Father's appellate argument, Father focuses his argument on whether "hospital/medical records" or "autopsy reports" are admissible pursuant to the business records exception. Father's Brief at 23. He presents no developed argument or cites to any relevant authority as it relates to the proper admission of CPS reports under the business records exception. **See In the Interest of R.G.**, No. 1047 EDA 2019, 2020 WL 734046, at *6 (Pa.Super. filed 2/12/20)[18] ("In dependency matters, reports such as the CPS report may be admissible under the business records exception outlined in Pa.R.E. 803(6)."). Accordingly, we find waived Father's challenge to the CPS reports. **See** Pa.R.A.P. 2119 (indicating an appellant

_____

[18] Pursuant to Pennsylvania Rule of Appellate Procedure 126, unpublished, non-precedential memorandum decisions of the Superior Court filed after May 1, 2019, may be cited for their persuasive value. Pa.R.A.P. 126(b).

must develop an argument with citation to relevant authority); ***Beshore***, ***supra***; ***Lackner***, ***supra***.

Regarding Father's contention that portions of Exhibit 7, relating to the autopsy report, should have been redacted or excluded, we find no relief is due. Father challenges the following portion of the autopsy report:

> As such, non-accidental head trauma is favored, although the precise mechanism cannot be determined. In addition, the presence of a healing posterior rib fracture, occurring approximately two to three weeks prior to her death, ia [*sic*] a harbinger of abusive injury (occurring at a separate time from the head injuries).

Father's Brief at 23-24 (quoting DHS Exhibit 7 pg. 2). Father contends the cited portions constitute inadmissible hearsay.

Assuming, *arguendo*, Father is correct, we conclude the trial court's admittance of the evidence was, at most, harmless error in the context of the court's determinations. ***See In re A.J.R.-H***, ***supra***. Specifically, Dr. Chu, whose expert testimony Father does not challenge on appeal, testified at length regarding G.M.'s head and rib injuries, and he testified to a reasonable degree of medical certainty that the injures resulted from inflicted trauma or abuse. ***See*** N.T., 1/14/22, at 63-124. Further, Ms. Robinson, who was offered as a witness by Mother, admitted she had safety concerns for N.M.M. and M.M. since G.M. sustained injuries, which could not be explained by Mother or Father. ***Id.*** at 131-32. Thus, Father is not entitled to relief.

For all of the aforementioned reasons, we affirm.

Affirmed.

- 32 -

*Judgment Entered.*

Joseph D. Seletyn, Esq.
*Prothonotary*

*Date:* 7/7/2022